## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DONNA A. HANCOCK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-15-1095-R** |
| | ) | |
| **GREYSTAR MANAGEMENT** | ) | |
| **SERVICES, L.P.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER

Before the Court are Defendant's Motion for Summary Judgment (Doc. No. 39) and Plaintiff's Motion for Partial Summary Judgment (Doc. No. 42). Parties have filed responses and replies as to each. The Court resolves these motions by entry of a single order.

The Court DENIES Defendant's Motion for Summary Judgment. The Court DENIES Plaintiff Hancock's Motion for Partial Summary Judgment.

### I.        Factual and Procedural Background

This case stems from a decision made by Greystar Management Services, L.P. (Greystar) to terminate one of its employees, Donna Hancock, shortly after Ms. Hancock suffered a heart attack. The following facts are either undisputed or viewed in the light most favorable to the nonmoving party.

1

Greystar provides multi-family property management services to residential apartment owners across the United States. It employed Ms. Hancock starting November 2013 as a Leasing Professional at one of its complexes, the Avana on Second Apartments, located in Edmond, OK. While the parties dispute what the job of Leasing Professional officially entails, the position seems to be chiefly responsible for interacting with prospective tenants by answering questions on site and giving tours of the property. While regular and predictable attendance is required of all Greystar employees, it is not identified as an essential job function of a Leasing Professional. That said, Greystar, like many companies, does have a written policy mandating consistent and punctual attendance. The company's Team Member Handbook requires employees, if they will be unexpectedly absent or late to work, to call their supervisor directly rather than having a fellow employee call on their behalf. Company policy also dictates that employees who fail to show up for work for three consecutively scheduled work days or who have a second instance of "no-call, no show" will be considered to have voluntarily resigned their position. All employees, including Leasing Professional, enjoy some form of leave, including sick time, vacation time, floating holidays, personal leave, and family leave. Def. Mot. Summ. J., Ex. 2, at 22.

Ms. Hancock's absences began Wednesday, August 6, 2014. The night before, she went to the hospital complaining of chest pain. She was admitted to the hospital early the morning of August 6. It is undisputed that Ms. Hancock herself did not alert Greystar that she would be absent on August 6, 2014. Rather, Ms. Hancock contacted Emily Nichols, the Assistant Manager at the Avana apartment complex in Midwest City, on the way to the

2

emergency room. Ms. Hancock believed Nichols would notify Jennifer Mauer, Ms. Hancock's supervisor and the Property Manager at the Edmond complex, of the emergency. Whether this communication took place or not, Greystone had not been notified by the start of business on August 6 that Ms. Hancock would be absent. That same day, Ms. Hancock was diagnosed with possible unstable angina and non-ST-elevation myocardial infarction. Her physician prescribed medication and ordered an angiography test.

Meanwhile, Greystar management still had not heard from Ms. Hancock. Finally, at 8:17 p.m. on that Wednesday, Mauer and Kelli Jones, a Regional Property Manager over several Greystar properties, received an email from Nichols informing them that Ms. Hancock had suffered a mild heart attack and she would be having tests done the morning of August 7, 2014. Greystar claims that Ms. Hancock violated company policy by not contacting Mauer about her absences to obtain formal leave and by not providing appropriate medical documentation. Ms. Hancock counters that Greystar neither explained the need for her to submit documentation nor requested documentation from her.

Greystar argues it was still unsure the morning of August 7 about Ms. Hancock's condition. Jones emailed Nichols to have her instruct Ms. Hancock to contact Mauer directly before close of business on Friday, August 8, 2014. Shortly after, around 2:43 p.m. on August 7, both Mauer and Jones received another email from Nichols explaining that "Donna just got out of procedure and found out she has 50% blockage in 3 of her arteries. Doctor said he thinks it can be treated with medication." That procedure confirmed that Hancock suffered from Coronary Artery Disease. More medications were prescribed.

3

Ms. Hancock finally spoke with Mauer around 3 p.m. on August 8 by phone. According to Ms. Hancock, she called Mauer to let her know the doctor had said she had suffered a mild heart attack; that she did not know when she would be able to return to work; that she was to be discharged from the hospital later that day; and that she would need to remain off work until she saw the doctor again on August 15.[1]

As scheduled, Ms. Hancock was discharged from the hospital on Friday, August 8, 2014. She was prescribed several medications at discharge. Greystar does not contest that Mauer told Hancock she did not need to report to work that weekend, August 9–10.  At dispute is whether Greystar had instructed, and Hancock had understood, that she needed to keep management apprised of her medical condition over the weekend and whether she was expected to be at work starting that Monday, August 11. Ms. Hancock contends she believed she needed to update Mauer after her August 15 appointment, when she would have more information. After Ms. Hancock did not report to work on Monday or Tuesday, Mauer called her to inform her she was being terminated for job abandonment.

On August 15, 2014, as anticipated, Hancock attended a follow-up appointment. A cardiovascular exam revealed a regular heart rate rhythm. Her physician prescribed more medication, ordered more follow-up appointments, and cleared her to return to work. Her appointments over the following months showed her heart rate was normal and her Coronary Artery Disease stable. Ms. Hancock's physician, however, did testify that Ms. Hancock continues to suffer from Coronary Artery Disease and that neglecting to take

---

[1] Ms. Hancock did attempt to contact Mauer earlier that day, but Mauer failed to return her call.

medication, monitor her blood pressure, or regularly exercise and diet could pose serious health risks. Greystar essentially contends that Hancock's lack of pain or recent heart complications, as well as her ability to accomplish day-to-day tasks, disqualify her from being disabled under federal law.

Ms. Hancock disagrees. She asserts discrimination claims under the Americans with Disabilities Act as Amended (ADAAA) and the Oklahoma Anti-Discrimination Act (OADA). Greystar has moved for summary judgment on both claims.[2] Ms. Hancock has moved for summary judgment as to several issues relevant to establishing a prima facie case.[3] For the following reasons, the Court DENIES both motions.

## II.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it affects the disposition of a substantive claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 247, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion and of identifying those portions of "the pleadings, depositions, answers to

---

[2] As both parties concede, the same burden of proof that governs the ADAAA also governs the OADA. "[T]he protections provided by the OADA are 'co-extensive with the protections provided by federal law under the ADA.'" *Hamilton v. Oklahoma City Univ.*, 911 F. Supp. 2d 1199, 1206 (W.D. Okla. 2012), *aff'd*, 563 F. App'x 597 (10th Cir. 2014).

[3] Specifically, Hancock asks the Court to grant summary judgment on the following:
  a. Plaintiff is disabled under the ADAAA.
  b. Plaintiff required time off work for treatment of her condition.
  c. Time off for medical treatment was a reasonable accommodation for Plaintiff's disability.
  d. Defendant neither accommodated Plaintiff nor engaged in the interactive process for accommodation.
  e. Defendant fired Plaintiff due to her disability and request for accommodation.

interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id*. When considering a motion for summary judgment, a court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III.    Discussion

The ADAAA provides in relevant part that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to" a number of actions by an employer, including the "discharge of employees" and "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(a),(b)(5)(A).

In proving that the challenged employment action was motivated at least in part by discriminatory intent, a plaintiff may either present direct evidence of the employer's discriminatory intent or present circumstantial evidence creating an inference of discriminatory intent under the burden shifting framework of *McDonnell Douglas Corp. v.*

*Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1114 (10th Cir. 2007).[4]

Under this burden shifting framework, a plaintiff must first establish a prima facie case of discrimination. *McKenzie v. Dovala,* 242 F.3d 967, 969 (10th Cir. 2001). She must show three things: "(1) that [she] is disabled within the meaning of the ADA; (2) that [she] is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that [she] was discriminated against because of [her] disability." *Id.* (quoting *Aldrich v. Boeing Co.,* 146 F.3d 1265, 1269 (10th Cir. 1998)) (internal quotation omitted). If the plaintiff successfully establishes a prima facie case, the employer must then articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Riggs,* 497 F.3d at 1114−15. If the employer does so, the burden shifts back to the employee to prove that the proffered legitimate reason is merely pretext for discrimination. *Id.* Only by proving pretext does a plaintiff survive summary judgment. *English v. Colorado Dep't of Corr.,* 248 F.3d 1002, 1008 (10th Cir. 2001).

---

[4] While Ms. Hancock maintains that this is one of the rare cases where the Tenth Circuit has held that *McDonnell Douglas* burden shifting might be inappropriate, the Court is unpersuaded. Ms. Hancock is correct that the Tenth Circuit has discarded the burden shifting framework where "the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability." *Davidson v. Am. Online, Inc.,* 337 F.3d 1179, 1189 (10th Cir. 2003). But that is not this case. Greystar's alleged original, indeed sole, reason for terminating Ms. Hancock was job abandonment. In cases where *McDonnell Douglas* burden shifting has been held inappropriate, there was little question that the disability itself played a concrete role in the employer's decision to take adverse action. *See, e.g., Davidson,* 337 F.3d at 1183 (employer admitted employee's deafness disqualified him for a position); *Hawkins v. Schwan's Home Serv. Inc.,* 2013 WL 2368813, *4 (W.D. Okla. May 28, 2013), *aff'd* 778 F.3d 877 (10th Cir. 2015) (employer placed an employee on unpaid leave after the employee failed his medical evaluation due to his heart condition). In contrast to *Davidson* and *Hawkins,* the employer here has not admitted that it relied on the disability itself in deciding to terminate the employee. Though Ms. Hancock's absences stem from her alleged medical condition, this does not constitute direct evidence of discriminatory intent.

## A. Disability

Ms. Hancock brings two claims under the ADAAA: wrongful termination and failure to accommodate.[5] Both claims require Hancock to prove that she is disabled as defined by the ADAAA. The ADAAA defines disability in three ways. First, a disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(2)(A). This definition of disability includes those impairments which currently substantially limit a major life activity. *Sorensen v. University of Utah Hosp.*, 194 F.3d 1084, 1086 (10th Cir. 1999). It also includes those impairments which substantially limited a person at the time of the employer's action but which no longer substantially limit a person. *See e.g., Baron v. Advanced Asset & Prop. Mgmt. Sols., LLC*, 15 F.Supp.3d 274, 277, 282 (E.D.N.Y. 2014) (holding that "a reasonable trier of fact could conclude that plaintiff suffered from a disability under the ADA" even though "plaintiff [was] no longer disabled and currently [had] no physical limitations"); *see also Rico v. Xcel Energy, Inc.*, 893 F. Supp. 2d 1165, 1170 (D.N.M. 2012) (refusing to dismiss plaintiff's ADAAA claim since the facts were "sufficient to raise an inference that Plaintiff was disabled *at the time of his termination*") (emphasis added). Second, a person is also disabled if she has "a record of such an impairment." 42 U.S.C. § 12102(2)(B). "To have a record of such an impairment, a plaintiff must have a history of, or been misclassified as having, an impairment that substantially

---

[5] While the Tenth Circuit has not definitively decided that the two are separate causes of action, it has noted the confusion and assumed as much. *See Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912, n.5 (10th Cir. 2004). Both parties have briefed the claims as if they are separate and the analysis is nearly identical at the summary judgment stage.

limited a major life activity." *Sorensen*, 1084 F.3d at 1087. Third, the ADAAA defines disability as "being regarded as having such an impairment." 42 U.S.C. § 12102(2)(C). This applies to situations where an employer mistakenly believes that a person has an impairment that substantially limits a major life activity or where an employer mistakenly believes that the person's impairment, which is not substantially limiting, does in fact substantially limit a person's major life activity. *Sorensen*, 194 F.3d at 1084. Ms. Hancock argues that she currently has a physical impairment or that she is at least regarded has having such an impairment. She does not argue that she has a record of such an impairment.

The Court pauses to emphasize the fact that Ms. Hancock has sued under the ADAAA, which became effective January 1, 2009, and which amended the Americans with Disabilities Act of 1990 (ADA). *See* 110 P.L. 325, 122 Stat. 3553, 3559 §§ 1, 8. In enacting the ADAAA, Congress was responding to "the holdings of the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and its companion cases [that had] narrowed the broad scope of protection intended to be afforded by the ADA." *Id.* § 2(a)(4) (italics added). Since the ADA was passed in 1990, "lower courts [had] incorrectly found in individual cases that people with a range of substantially limiting impairments [were] not people with disabilities." *Id.* §2 (a)(6). Thus, under the now-amended ADA, a plaintiff must still prove that his physical or mental impairment substantially limits one or more of his major life activities. Yet unlike before, the term "substantially limits" is "not meant to be a demanding standard" and is thus "construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(i). Further, "major life activities" now include "the operation of a major bodily function." 42

U.S.C. § 12102(2)(B). And—critical to this case—a major bodily function encompasses the "circulatory" and "cardiovascular" systems of a person. 29 C.F.R. § 1630.2(h)(1)−(2).

Two additional points should be noted before taking up the parties' cross motions for summary judgment. One, determining whether Ms. Hancock's heart condition substantially limits her cardiovascular and circulatory systems must "be made without regard to the ameliorative effects of mitigating measures," such as medication. 42 U.S.C. § 12102(4)(E)(i). Two, though her heart problems seem to be stable today—possibly because of medication and other preventive care measures—that alone is not disqualifying; for purposes of the ADA, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major activity when active." 42 U.S.C. § 12102(4)(D).

A reasonable trier of fact could conclude that Ms. Hancock is disabled under the ADAAA. She has offered evidence of the seriousness of her heart condition at the time of her termination along with testimony from her treating physician that she still suffers from Coronary Artery Disease. He testified that the disease "substantially limits the proper functioning of the cardiovascular system" and that serious medical complications could arise if Ms. Hancock were to dispense with taking her medications, monitoring her blood pressure, and routinely exercising and dieting. Her condition is unlike that of the plaintiff in *McKenzie-Nevolas v. Deaconess Holdings LLC*, which Greystar points to for the proposition that Ms. Hancock's heart condition is not serious enough to constitute a disability. 2014 WL 518086, at *1 (W.D. Okla. Feb. 7, 2014). Greystar is correct that both Ms. Hancock and the plaintiff in *McKenzie-Nevolas* saw their health improve after the original diagnosis. *Id.* at *4. But unlike the plaintiff's cellulitis and mastitis in *McKenzie-*

*Nevolas*, Ms. Hancock's heart condition and its effects have not been entirely cured through medication. Rather, testimony from her physician shows that neglecting treatment would likely exacerbate her heart problems.

That said, Greystar has at least put forth sufficient evidence of Ms. Hancock's health at the time of termination and today to preclude the court from finding for Ms. Hancock on the disability issue. A question of fact remains as to whether Ms. Hancock's circulatory and cardiovascular system, as "compared to the average person in the general population," substantially limited her at the time of her termination and continue to do so today. *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1218 (10th Cir. 2010).

## B. ADAAA – Qualified Individual

To establish the second element of her prima facie case, Ms. Hancock must prove that she was qualified, with or without reasonable accommodation, to perform the essential functions of her job. *MacKenzie*, 414 F.3d at 1274. The Court considers two criteria when determining whether a plaintiff is a qualified individual for purposes of the ADAAA: "First, the court determines whether the individual can perform the essential functions of the job. Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable him to perform those functions." *Davidson,* 337 F.3d at 1190.

Greystar correctly argues that Ms. Hancock was unable to perform the essential function of her job because she was absent. After all, "[a]ttendance is generally an 'essential' function of any job." *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000).

Thus, "an employer is not required to relieve an employee" of her obligation to attend work. *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 987 (10th Cir. 2012). Despite this, "it is well-settled that a request for leave may . . . allow an employee sufficient time to recover from an injury or illness such that the employee can perform the essential functions of the job (i.e., attend work) in the future." *Cisneros*, 226 F.3d at 1129.

Because Ms. Hancock was indisputably absent from work—i.e., "unable to perform an essential function" of her job—"the next inquiry is whether [she] could perform [her] job with reasonable accommodations." *Davidson*, 337 F.3d at 1192. These accommodations can include, but are not limited to, "modified work schedules," 29 C.F.R. § 1630.2(o)(2)(ii), and "allowance of time for medical care or treatment." *Rascon v. U.S. West Commc'ns., Inc.*, 143 F.3d 1324, 133–34 (10th Cir. 1998).

Whether Ms. Hancock did in fact request an accommodation hinges on her phone conversation with Jennifer Mauer on August 8, 2014. Ms. Hancock's recollection of that conversation was as follows:

> Q: Okay. Tell me the nature of your conversations—Well first of all, how did that conversation take place? Was that over the phone? Over Skype? Email? In person?
> A: Over the phone.
> Q: And who called who?
> A: I called her to let her know what the doctor had told me.
> Q: Okay. Tell me what you told her exactly.
> A: I told her that the doctor said I had had a mild heart attack; that I didn't know when I'd be able to return back to work; that I would be discharged that day, on the 8th, but I had not been discharged from the doctor.
> Q: And that was a Friday?
> A: Yes.
> Q: And did Jennifer Mower [sp] tell you something to the effect of, "Okay, check back with me on Monday"?

12

A: No.

Q: And what did she tell you in response to you telling her that you were going to possibly be discharged on the 8th?

A: It was pretty much, "Okay."

Q: And on the 8th, you told her that you didn't know when you were going to return to work?

A: Because I didn't know because the doctor had not discharged me yet, and I was to see the doctor on the following Thursday.

Q: Okay. And so, all Jennifer Mower [sp] said was, "Okay"? Did she say anything else, to the best of your recollection?

A: To the best of my recollection, she did not.

Q: Okay. So how did that conversation end? When did you say—

A: That I would keep her updated.

***

A: On the 8th, I told her – I told Jen Mower [Mauer] that the doctor said I had a mild heart attack, and that I was not to do anything until he released me from his care.

***

Q: Okay. And just to make sure I understand the sequence of events, when you spoke with [Mauer] on the 8th, did you inform her that you had another doctors appointment on the 15th?

A: Yes.

***

Q: Okay. And during that conversation, did you believe that you had communicated to [Mauer] that you would need to remain off work until the 15th due to doctor's orders?

A: Yes.

Def.'s Mot. Summ. J., Ex. 3, at 36–37, 66, 82. Greystar contends that this conversation did not constitute an actual request for an accommodation, and that even if this was a request for an accommodation, it was not a reasonable one, since an employee's request for leave must "state the expected duration of the impairment." *Valdez v. McGill*, 462 Fed.Appx. 814, 818 (10th Cir. 2012) (internal citations omitted). The fact remains, though, that Mauer could have followed up with Hancock to determine if her leave would

13

actually be indefinite. And this failure precludes summary judgment: "when the employer fails to engage in the interactive process, it is not likely that an employer will be able to establish on summary judgment the absence of a disputed fact as to the existence of a reasonable accommodation." *Valdez*, 462 Fed. Appx. at 819 n.5 (10th 2012) (internal quotations omitted). To avoid summary judgment, each party only need show that there is a genuine dispute of fact as to whether Ms. Hancock "ma[de] clear that [she] want[ed] assistance for [her] disability." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011). Ms. Hancock's request did not need to "formally invoke the magic words 'reasonable accommodation.'" *Id.; also see Foster v. Mountain Coal Co., LLC*, __ F.3d. __, 2016 WL 3997425, at *8 (10th Cir. July 26, 2016) (noting that while plaintiff "certainly didn't use those magic words"—reasonable accommodation—"he said enough to survive summary judgment" on the adequacy of his request). Summary judgment on the issue of whether Ms. Hancock requested a reasonable accommodation is therefore inappropriate.[6]

## C. ADAAA – Pretext

The sole, albeit consistent, reason Greystar has given for why it terminated Ms. Hancock is job abandonment. With Greystar having put forth a legitimate, non-discriminatory reason for its challenged action, the burden shifts back to Ms. Hancock to prove that Greystar's proffered reasons is merely pretext. *Riggs*, 497 F.3d at 1114–15. The

---

[6] Because Greystar does not argue that Ms. Hancock has failed to establish the third element of her prima facie case, i.e. that she was discriminated against because of her disability, the Court does not take up this argument. *See, e.g., Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008). Ms. Hancock, however, has moved for summary judgment on the issue of whether she was fired because of her disability. For the reasons discussed below, particularly Greystar's cited reason for firing Ms. Hancock, there remains a genuine dispute of fact which precludes summary judgment on that issue as well.

Court finds that Ms. Hancock has identified ample evidence that would support a finding of pretext so as to avoid summary judgment.

"[A] plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007). "In establishing pretext, an employee can show the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) (quotation marks omitted).  And importantly, "all doubts concerning pretext must be resolved in plaintiff's favor." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997).

Ms. Hancock contends the following qualifies as pretext. First, she alleges that Greystar is inconsistent as to how many times Ms. Hancock was allegedly absent without notice. For instance, Mauer's email to Jones on August 12 counts three; her affidavit suggests five. Greystar's filing with the EEOC also listed five; yet Jones only identifies four. Further, there is contradictory evidence on when Greystar actually made the decision to terminate Ms. Hancock and who was involved. Ms. Hancock also argues Greystar handled her attendance issues differently than it had for other employees. She offers evidence that other employees who violated Greystar's attendance policy received counseling and discipline for attendance issues before being terminated. Finally, a reasonable jury could at least find it implausible that Greystar truly tried to accommodate Ms. Hancock. It cites her failure to provide proper documentation for her medical condition, yet it never requested those documents from Hancock. In fact, Greystar never

15

called Ms. Hancock on August 11 despite claiming it expected her to either be at work or contact the office. Greystar knew Hancock had a doctor's appointment on August 15 yet terminated her before August 15 despite her having accumulated adequate vacation and sick leave to cover the period. While the weight of the evidence certainly falls short of establishing discriminatory intent as a matter of law, there is at least a genuine issue of fact as to whether such discriminatory intent existed.

### Conclusion

For these reasons, the Court DENIES Defendant Greystar's Motion for Summary Judgment (Doc. No. 39) and DENIES Plaintiff Donna Hancock's Motion for Partial Summary (Doc. No.42).

IT IS SO ORDERED this 18th day of October 2016.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE